The document below is hereby signed.

Dated: July 25, 2011.



_____
**S. Martin Teel, Jr.**
**U.S. Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

In re                                    )
                                         )
ANDRE CHREKY,                            )    Case No. 10-00268
                                         )    (Chapter 11)
                    Debtor.              )

MEMORANDUM DECISION ON REMAND FROM DISTRICT
COURT ADDRESSING OBJECTIONS TO DEBTOR'S EXEMPTIONS

When Ronnie Barrett and Jennifer Thong had concluded
presenting their evidence in support of their objections to the
exemptions that had been claimed by the debtor, Andre Chreky,
this court delivered an oral decision ruling that the objections
must be overruled.  First, I held that Mr. Chreky and his wife,
Serena Chreky, own certain accounts and certificates of deposit
at Adams National Bank as tenants by the entireties.  Second, I
held that Mr. and Ms. Chreky may jointly be a member in a limited
liability company, SPAC, LLC.  On appeal by Barrett, the district
court ruled that this court made errors of law in addressing
these issues.  Applying the law as articulated by the district
court, I once again find that the objections must be overruled.
This constitutes the court's finding of fact and conclusions of
law on remand, addressing the issues at the conclusion of the

evidentiary case that had been presented by Barrett and Thong
prior to Barrett's appeal.

I

BACKGROUND

Mr. and Ms. Chreky have been married since 1987.  They have
been operating a hair salon through an entity known as Andre
Chreky, Inc., which was formed on May 2, 1996.  Mr. Chreky owns
100 percent of the shares of Andre Chreky, Inc., which operates a
hair salon known as the Andre Chreky Salon.  In September 1996,
Mr. and Ms. Chreky formed an entity called SPAC, LLC.  That
entity was formed for the purpose of acquiring and owning
non-residential rental property, specifically a property located
at 1604 K Street Northwest, where Andre Chreky, Inc. operates its
business, leasing the real property from SPAC, LLC pursuant to a
lease arrangement.

Mr. and Ms. Chreky are both employees of Andre Chreky, Inc.
As his salary, Mr. Chreky receives $520,000 per year plus tips.
Ms. Chreky receives $260,000 per year.  Their salaries have not
changed in the past ten years.  Ms. Chreky deposits her bi-weekly
paychecks into her personal, solely-owned bank account at
SunTrust Bank, and she pays the family bills from that account.
Mr. Chreky deposits his bi-weekly paychecks into a joint money
market account at Adams National Bank.  The money market account
is in the names of both Mr. and Ms. Chreky.  Mr. and Ms. Chreky

2

used funds from this money market account periodically to purchase certificates of deposit ("CDs") in the names of Mr. and Ms. Chreky.  Those CDs (or the accompanying account opening sheet) provide that they are multiple party accounts with rights of survivorship, although one CD additionally named Mr. and Ms. Chreky's daughters as pay-on-death beneficiaries.  Mr. and Ms. Chreky later transferred money from the CDs into a Certificate of Deposit Account Registry Service ("CDARS") account, which is held in the names of both Mr. and Ms. Chreky.

Ms. Chreky has only made two deposits of her own funds into the money market account. In April 2006, Andre Chreky, Inc. paid a bonus of $363,500 to Ms. Chreky, which netted $217,000 after taxes.  The check was made payable to Ms. Chreky, but Mr. Chreky endorsed it.  The check was deposited into the money market account.  In April 2007, Andre Chreky, Inc. paid a bonus of $700,000 to Ms. Chreky, which netted $404,000 after taxes.  Ms. Chreky deposited that check into the money market account.

In September 2006, Thong, who was an employee of Andre Chreky, Inc., sued Mr. Chreky and Andre Chreky, Inc., claiming sexual assault, harassment, and retaliation.  Also in September 2006, Barrett, who also was an employee of Andre Chreky, Inc., notified Mr. Chreky that she planned to file a lawsuit against him.  In February 2007, Barrett filed that lawsuit against Mr. Chreky and Andre Chreky, Inc., claiming sexual harassment and

retaliation.  Following a jury trial, Barrett has a judgment against Mr. Chreky and Andre Chreky, Inc. for $2.3 million. Following a court-approved settlement, Thong has a judgment against Mr. Chreky and Andre Chreky, Inc. for $7 million. Barrett and Thong are the two primary creditors in Mr. Chreky's bankruptcy case.

Mr. Chreky claimed that his interest in SPAC, LLC and his interests in the Adams National Bank money market account, the CDs, and the CDARS were exempt as tenants by the entireties property.

II

EXEMPTION OF JOINTLY OWNED BANK
ACCOUNT, CD ACCOUNTS, AND CDARS ACCOUNT

Barrett and Thong objected to the debtor's exemption of the debtor's interests in the Adams National Bank money market account, CDs, and CDARS accounts held in the names of Mr. and Ms. Chreky.  Mr. Chreky asserted that his interests in these accounts were exempt under 11 U.S.C. § 522(b)(3)(B) on the basis that the accounts were tenancy by the entireties property.

A

If these accounts were tenancy by the entireties property, Mr. Chreky's interests were exempt because District of Columbia law places such property beyond the reach of creditors other than joint creditors of Mr. and Ms. Chreky.  *Roberts & Lloyd, Inc. v. Zyblut*, 691 A.2d 635, 638 (D.C. 1997).  Because Ms. Chreky is not

4

indebted to Barrett or Thong, Mr. Chreky's interest in tenancy by the entireties property would be beyond the reach of Barrett and Thong, and could properly be claimed to be exempt.

B

The first issue is whether Mr. Chreky intended to confer a joint ownership interest upon Ms. Chreky in the subject funds. In *Harrington v. Emmerman*, 186 F.2d 757, 761 (D.C. Cir. 1950), the court of appeals held that "when a depositor creates a joint account for himself and another, **without consideration,** it is presumed to have been done for the convenience of the depositor" (citations omitted and emphasis added).[1]  The presumption may be rebutted.

In *Imirie v. Imirie*, 246 F.2d 652 (D.C. Cir. 1957), the court of appeals added additional glosses to the application of the presumption.  It held that when only one spouse has provided the funds in a jointly owned bank account, and even when the bank cards signed by both spouses expressly recited a right of survivorship, the presumption is that the account was not intended as a present gift and is not subject to a right of survivorship.  *Imirie*, 246 F.2d at 653, citing *Harrington v. Emmerman* and *Murray v. Gadsen*, 197 F.2d 194 (D.C. Cir. 1952).  In the case of a business account, the presumption must be rebutted

---

[1]     That holding was reiterated in, for example, *Prather v. Hill*, 250 A.2d 690 (D.C. 1969), and *Zyblut*, 691 A.2d at 639.

by clear and convincing evidence showing a donative intent after "careful judicial scrutiny of the impact of the transaction" to avoid "fraud and injustice." *Imirie*, 246 F.2d at 653.  In the case of a personal account, the presumption must be rebutted by clear and convincing evidence showing a donative intent, but does not require the same level of "careful scrutiny."  *Id.*

Here, the money market account, the CDs and the CDARS account at issue were *not* business accounts.  Accordingly, if the funds here are treated as sole-depositor funds, and there was no consideration for the deposits into the joint money market account (from which the CDs and the CDARS account were derived), the presumption that would arise need only be rebutted by clear and convincing evidence.

C

I will bypass the issue of whether the funds deposited into the Adams National Bank joint money market account (and used, in turn, to fund the CD and CDARS accounts) were from Mr. Chreky as a sole depositor, and without deciding the issue, will treat them as though they were such.  I will address instead whether the presumption under *Harrington* and *Imrie* is inapplicable for other reasons or has been rebutted.

With respect to the sole depositor issue, Barrett wanted to present evidence that Ms. Chreky's bonuses deposited into the joint account were fraudulent conveyances from Andre Chreky,

Inc., and thus void for purposes of assessing the sole depositor issue.[2]   It is unnecessary to receive such evidence.   In Barrett's and Thong's favor, I will assume (without deciding) that the transfers of the bonuses into the joint money market account were fraudulent conveyances and thus void, making Andre Chreky the sole depositor.   Nevertheless, as discussed in part E, below, the overwhelming evidence clearly and convincingly establishes that the funds at issue are held by Mr. and Ms. Chreky as tenants by the entireties even if Mr. Chreky was the sole depositor.   This moots the necessity of taking evidence regarding whether the bonuses were fraudulent conveyances.

It is important to note, however, that the overruling of the objections to exemptions is not the end of the matter.   As discussed in part H, below, finding that the accounts are tenancy by the entireties property, as to which Mr. Chreky's interest can be exempted, does not immunize the transfers into the accounts from attack via a fraudulent conveyance action.   Property that was fraudulently transferred to a tenancy by the entirety account is subject to the transfer being set aside as a fraudulent conveyance and the funds being recovered for the benefit of the

---

[2]   This was the only issue as to which Barrett attempted to present evidence as to the fraudulent transfer issue.   She agreed at the outset of the hearing that fraudulent conveyance issues would not be tried, and viewed only Mr. Chreky's reliance on the deposits of Ms. Chreky's bonus checks to show that the account was not a sole-depositor account as opening the door to receive evidence as to the fraudulent conveyance issue.

estate in accordance with 11 U.S.C. §§ 544(a), 548, and 550.  A
fraudulent transfer of funds to a tenants by the entireties
account is just as avoidable as a fraudulent transfer to a
debtor's spouse outright, and once the transfer is avoided, the
exemption of the account as tenancy by the entireties property is
an exemption of nothing, for it is deemed that there was never a
conveyance into the tenancy by the entireties account.

D

As I conclude in part E, below, the Adams National Bank money
market account was established with Ms. Chreky having a joint
ownership interest in the account.  Property held by spouses as
joint tenants is presumptively held as tenants by the entireties.
*Settle v. Settle*, 8 F.2d 911 (D.C. Cir. 1925), and as I discuss
in part H, below, that presumption has not been rebutted.
Subsequent deposits into the tenancy by the entireties account
necessarily partook of that character and became part of the
tenancy by the entireties account.

When the joint money market account was used to make
purchases of CDs, those CDs continued to be tenancy by the
entireties property under the rule of *Roberts & Lloyd, Inc. v.
Zyblut*, 691 A.2d 635, 638 (D.C.1997), that "in the absence of an
agreement to the contrary, each spouse retains a tenancy by the
entireties in the proceeds from the sale of property held as a
tenancy by the entireties." (citation omitted).  There was no

8

evidence of an agreement to do away with the tenancy by the entireties character of the property when the joint money market account funds were used to purchase CDs.

Similarly, when the joint money market account funds or CDs were used to purchase the CDARS account in September 2008, the CDARS account (as proceeds of tenancy by the entireties property) necessarily continued to be tenancy by the entireties property as there was no intention to do away with the tenancy by the entireties ownership.

Nevertheless, even disregarding the *Zyblut* rule just quoted, as though the source of the CDs and CDARS account having been the tenants by the entireties money market account does not matter, the evidence as discussed in part E, below, also established by clear and convincing evidence that the CDs and the CDARS account were jointly owned.

E

To address that issue of joint ownership, the facts must be explored in greater detail.  In making the following findings, I apply to Mr. Chreky a burden of proving by clear and convincing evidence that a joint ownership was given to Ms. Chreky in the Adams National Bank funds.  As I said in my prior oral decision, the evidence was overwhelming that the money market account was intended to be a jointly owned account, and I conclude on remand that this overwhelming evidence clearly and convincingly

9

establishes that the money market account was intended to be a jointly owned account.  The evidence also establishes clearly and convincingly that the CDs and the CDARS account were intended to be jointly owned property.

Prior to the formation of Andre Chreky, Inc., Ms. Chreky raised the family's two daughters and obtained a Masters in Business Administration from Virginia Tech.  Andre Chreky, Inc. was formed in 1996 as a hair salon, some ten years prior to the first law suit brought by Barrett or Thong.  Shortly after the hair salon commenced operations and continuing to today, Ms. Chreky has actively participated in that business, handling the financial side of the business, whereas Mr. Chreky, who has a cosmetology license, dealt with customers of the company.  Mr. Chreky is not sophisticated in financial matters, and he relied heavily upon his wife and accountants to handle the financial side of the business and to handle the couple's personal financial affairs.

As noted already, Mr. and Ms. Chreky are both employees of Andre Chreky, Inc.  From the outset of the company, Mr. Chreky has served as the company's president, and Ms. Chreky has served as the company's vice president and secretary.  Ms. Chreky:

- has acted as the company's human resources manager, healthcare administrator, and inventory manager,

10

- has supervised accounting functions (including payroll processing, calculation of hours, the time cards collection and storage, interfacing with the company's payroll processing company, ADP, and interfacing with the company's bookkeeper and its CPA to ensure that the company's taxes are filed appropriately), and

- has handled marketing, advertising, promotions, public relations, information technology, and education of employees.

In short, Ms. Chreky has handled all of the behind-the-scenes business-related operations that it takes to run the company.

Ms. Chreky additionally guaranteed a substantial obligation of Andre Chreky, Inc. even though the company is solely owned by Mr. Chreky.[3]  Together, Mr. and Ms. Chreky built Andre Chreky, Inc. into a highly profitable hair salon.

Beyond those contributions to the family's economic endeavors, Ms. Chreky has deposited her bi-weekly paychecks, and reimbursements from the company for home office and other company-related expenses, into her personal, solely-owned bank account at SunTrust Bank, an account she opened before the couple

---

[3]  In 1997, Andre Chreky, Inc. borrowed money from Adams National Bank to make renovations to the company's space, to pay off a note owed Equitable, and to obtain additional working capital.  Ms. Chreky guaranteed the $1,200,000 loan.

wed.[4]  Consistent with her role as the manager of the family's

financial affairs, she used those funds to pay family bills,

including joint income tax liabilities, and Mr. Chreky's credit

card charges and other personal expenses (other than purchases he

made with tips that he used as walking around money).  She uses

it also to meet expenses of Ms. Chreky's unemployed brother, but

the primary purpose of that account has been to pay ongoing

family expenses.  Over $2,000,000 of Ms. Chreky's funds deposited

into the SunTrust account was applied to meet family expenses.[5]

The SunTrust account was not intended for retirement purposes:

funds deposited routinely went towards meeting family expenses.

In contrast, Mr. Chreky has never paid household bills.  Mr.

Chreky generally deposited his bi-weekly paychecks into a joint

money market account at Adams National Bank (an example of an

---

[4]  At one point, the couple established a jointly owned
money market account at SunTrust, initially in the amount of
$5,000, but they later closed it when the interest it was earning
was exceeded by the maintenance fees.

[5]  In May 2008, Ms. Chreky made $74,665.63 in transfers from
the SunTrust account into her own Smith Barney stock brokerage
account.  But on April 27, 2007, Ms. Chreky had transferred
$50,000 from her Smith Barney account to meet family medical and
tax expenses.  The result is that only a net of $24,665.63 was
used by Ms. Chreky for herself for purposes other than ordinary
family expenses.  Similarly, in April and May of 2007 there was a
$23,000 payment from the SunTrust account to Citibank and a
$22,000 payment from the SunTrust account to VGI Investment.
Although Ms. Chreky could not recall what those payments were
for, she did not recall having personal accounts at either
Citibank or VGI Investment, and, in any event, the amounts were
insignificant in comparison to the expenditures from the account
predominantly for family expenses.

exception being when his paycheck on occasion was given to Ms.
Chreky to deposit into the SunTrust account in order to meet any
shortfall in paying income taxes).  That money market account, in
existence since close to when Andre Chreky, Inc. began to
operate, was set up with Ms. Chreky as the point of contact with
the bank.[6]  The Adams National Bank money market account is in
the names of both Mr. and Ms. Chreky as joint owners.

Ms. Chreky did not engage in her guaranteeing a substantial
debt obligation of Mr. Chreky's solely-owned company, Andre
Chreky, Inc., and in her using her salary to meet family expenses
(towards which Mr. Chreky made little contribution) with no
expectation of nothing in return from Mr. Chreky.  The couple
understood from the outset that they were utilizing the Adams
National Bank account to save money jointly, and they intended
that the joint account be held as a savings account for the
couple's retirement.  They were not parking funds for Mr. Chreky
individually in the joint account with Ms. Chreky having access
to the funds only as a convenience to Mr. Chreky.

Ms. Chreky inherited money from her father and used that to
open her Smith Barney brokerage account.  That account stood at
roughly $600,000.  Mr. Chreky had a relatively small IRA account

---

[6]  At one point, Adams National Bank alerted Ms. Chreky that
someone was trying to gain access to the joint bank account.  The
decision was made to close the account and open a new joint bank
account.  For purposes of this decision, the two joint money
market accounts can be treated as one and the same.

in his own name.  That Ms. Chreky, in contrast, had a relatively large brokerage account in her own name, does not suffice to demonstrate that the Adams National Bank money market account was not intended for her benefit.  That account consisted almost exclusively of her inheritance.  It is natural for a wife who inherits wealth to want to keep that wealth in her own name: if her husband died or the couple divorced, she would want to still own her inherited wealth outright.  In contrast, the Adams National Bank money market account was *not* inherited wealth. Instead, it came from Mr. Chreky's paycheck and was deposited in a joint account, intended for joint savings purposes, in recognition of Ms. Chreky having devoted her paycheck to paying joint family expenses, and a desire to have a joint savings account.

Checks could be drawn on the Adams National Bank money market account, but because the couple intended for the account to be a savings account for retirement, they did not obtain a supply of preprinted checks for the account.  Its purpose was not to meet day to day family expenses.  Nor was it used as a business account to fund ongoing operations of Andre Chreky, Inc., which had its own operation accounts.

On occasion, the couple did cause funds in the joint account to be used to meet extraordinary expenditures on behalf of the couple, based on joint decisions of the couple.  This was

14

consistent with the couple's intention that the joint money
market account be held as a savings account for the benefit of
the couple.  As Ms. Chreky explained, the money market account
"was our joint savings account.  That's how we saved our money,
and we only used it when it was absolutely necessary."  Except
for a purchase of a boat and trailer, which Mr. and Ms. Chreky
went together to the boatyard to purchase, Ms. Chreky was the one
who effectuated the transfers from the joint account for those
purposes.  The expenditures from the Adams National Bank money
market account were these:

- In January 2007, Ms. Chreky used the joint account to
  open up custodial accounts for the couple's two
  daughters, with Ms. Chreky acting as custodian of those
  accounts.  Ms. Chreky signed the advice of debit used
  to make the transfers for that purpose.[7]  Thereafter,
  in 2008, 2009, and 2010, additional transfers were made
  from the Chrekys' joint money market account bringing
  to $402,000 the aggregate of transfers to the custodial
  accounts.

- On April 18, 2008, Ms. Chreky signed a check on the
  joint account and deposited it into the SunTrust
  account on April 24, 2008, in order that funds were on

---

[7]  Ms. Chreky signed an advice of debit of $100,000 on the
joint account to make a deposit of $50,000 to each of the two
custodial accounts.

hand to cover payment from the SunTrust account of the couple's income tax liabilities.

- In 2009, Mr. and Ms. Chreky decided to pay off an aggregate of $193,000 in Chase Home Finance mortgages on the couple's Great Falls, Virginia home[8] and Oakland, Maryland vacation home (when interest rates had dropped substantially in comparison to those mortgages' interest rates).  Ms. Chreky took the necessary steps in March and April 2009 to effectuate the payoffs.[9]

- In March 2009, the Chrekys went to a boatyard to purchase a boat and trailer, each titled in the name of both spouses as joint owners.  To effect the purchase, Mr. Chreky signed a Adams National Bank counter check drawing on the joint money market account.

- On March 13, 2009, Ms. Chreky wrote a $9,000.00 check to herself on the money market account and deposited

_____

[8]  The Great Falls home was Mr. Chreky's before the couple wed, and he transferred title to both spouses after they wed. Although the record does not show whether Ms. Chreky was liable on the Chase mortgage on the Great Falls home, the mortgage nevertheless was an *in rem* debt that encumbered Ms. Chreky's interest in the home.

[9]  To accomplish that, she used bank counter checks and a cashier's check.  She filled out the two bank counter checks of $30,000 each and signed one, and although she forgot to sign the other one, it nevertheless went through.  She also obtained the cashier's check to make a $133,255.02 payment.

that check in the SunTrust account that was used to pay
household bills.

Mr. Chreky does not recall being consulted beforehand regarding
the utilization of the joint money market account to pay off
mortgages or to establish custodial accounts for the couple's
children, but I credit Ms. Chreky's testimony that these were
joint decisions.  Nevertheless, Ms. Chreky was the driving force
(as the individual more savvy in financial matters) in making
decisions regarding what expenditures would be made from the
joint account for the benefit of the couple, and this was
especially true when there were financial considerations driving
the decision.  She, not Mr. Chreky, was the individual with a
masters in business administration.

Barrett and Thong point out that these uses of the joint
account to pay joint expenses occurred after Thong had sued Mr.
Chreky in September 2006 seeking millions of dollars in damages,
and, in large part, after Barrett had sued Mr. Chreky in February
2007 seeking millions of dollars in damages.  They also point out
that these transfers, for the most part, were made after the
deposit of bonus checks of $217,000 in April 2006 and $404,000 in
April 2007 into the money market account that they contend were
the result of a fraudulent conveyance by Andre Chreky, Inc. to
Ms. Chreky.  Again, if there was any defrauding of creditors,
that can be addressed via a fraudulent conveyance action.  Even

17

if the funds held in the account could be deemed to be
exclusively fraudulently-conveyed funds, that would not defeat
Mr. Chreky's intention that Ms. Chreky have an interest in the
accounts, and these uses of the joint account demonstrate that
the account was not simply a place where Mr. Chreky parked his
own funds, having no intention for Ms. Chreky to have an interest
in the account.  Moreover, even if these uses were disregarded,
the evidence is still clear and convincing that Ms. Chreky, who
year after year contributed her own salary to meet the bulk of
family expenses, and who guaranteed substantial debt of Mr.
Chreky's solely owned business, was to have a joint ownership of
the joint money market account as a savings account for the
couple.

Barrett and Thong make much of Ms. Chreky's never having
used the joint money market account for a purchase solely for Ms.
Chreky's benefit, but the couple's intention was to hold this as
joint owners for joint purposes, principally for the couple's
retirement.  The intent to convey a joint ownership interest to
Ms. Chreky is not defeated by the couple's intention that the
account be used as a savings account (principally as a retirement
account) and not an account that she would freely draw upon, nor
by the couple having drawn upon the account only for an
occasional expenditure towards meeting the joint needs of the
couple and not Ms. Chreky's sole needs.

18

Nor is that intent defeated by Mr. Chreky having included the assets at issue here on his Schedule B in the bankruptcy case, as he also made clear that his interest was as a tenant by the entireties.

Nor is the intent defeated by Mr. Chreky's listing the assets at issue here on a list of assets he submitted in Barrett's civil action for purposes of fixing punitive damages. The list in Barrett's civil action (Thong's proposed Exhibit I attached to Dkt. No. 176 in this proceeding) included not only Mr. and Ms. Chreky's jointly owned accounts but also the accounts of their children. That list was not for the purpose of listing assets to which Barrett would have access as a judgment creditor but for purposes of the jury's taking into account Mr. Chreky's wealth (including the assets at issue here which were held as joint savings investments) in order to fix punitive damages. No evidence was offered to show that the list was meant to be an admission that the listed accounts were accounts solely owned by him and not accounts in which his wife or in which his daughters had an interest. Accordingly, the list was not relevant to the issue of Mr. Chreky's intention in establishing the joint account.

Nor is the intent defeated by a joint personal financial statement, prepared by the bookkeeper at Andre Chreky, Inc., apparently for submission to Adams National Bank, and signed by

19

Mr. and Ms. Chreky, which listed Mr. Chreky in the Owner column
for the money market account.  Mr. Chreky *was* an owner (as a
tenant by the entireties) of the money market account; there is
no evidence that it would have mattered to Adams National Bank
whether it was Mr. Chreky, Ms. Chreky, or the couple jointly who
owned the account; and the listing of Mr. Chreky as owner is
sufficiently ambiguous that it does not affirmatively negate that
Ms. Chreky was also an owner.[10]

Nor is the intent defeated by a stipulation in Barrett's
civil action against him, again introduced with respect to the
punitive damages issue in that action, that the combined net
worth of Andre Chreky, Inc. and Andre Chreky was $6,000,000.[11]

---

[10]  Even if it could be viewed as a statement that Ms.
Chreky had no ownership interest, the  statement mistakenly
listed Ms. Chreky as an owner of Andre Chreky, Inc., and listed
the couple's residence as individually instead of jointly owned.
At most, the statement was a mistake in listing Mr. Chreky as an
owner, and this carelessly prepared financial statement cannot be
given any meaningful weight in assessing Mr. Chreky's intent.

[11]  The stipulation that there was a $6,000,000 net worth on
the part of Mr. Chreky was couched with a further stipulation
that:

> the parties to this action have entered into a negotiated
> stipulation regarding the net worth of the Defendants.
> That stipulation has been made only for the purposes of
> instructing the jury in this case and for no other
> purpose.  Without limitation, neither the stipulation or
> anything in it shall be taken as evidence that either
> Defendant is or is not the alter ego of any other person
> or entity, nor shall it be introduced as or taken for
> evidence that the net worth of either or both the
> Defendants is as stated therein in any other proceeding.
> Nothing in this stipulation waives any argument any

Nor is the intent defeated by Mr. Chreky's having over time engaged in conduct that resulted in or could have resulted in creditor claims against him, a threat that Barrett and Thong contend could have impelled him to set up the joint account as a vehicle to make it difficult for such creditors to reach the salary checks he received.  Dating back to at least the mid-1980s (before the Chrekys wed), Mr. Chreky faced the threat of liability from creditors.[12]  The claims or potential claims of any significance that Barrett and Thong argue show that the joint money market account was set up to avoid the claims of creditors were these:

(1) As a result of an arbitration, Mr. Chreky was ordered in February 1997 to pay his sister, Lisette Attias, more than $40,000 with respect to responsibility for outstanding debts owed to the landlord of another hair salon, Piaf Salon, that Mr. Chreky had operated with Attias prior to his starting his own salon in 1996. Attias has accused Chreky of having stolen employees and supplies from Piaf in starting the Andre Chreky Salon,

---

Defendant or other entity or person may make respecting the enforcement or judgment in this matter.

[12]  The claims of Barrett and Thong (claims made based on Mr. Chreky's conduct towards them as employees of Andre Chreky, Inc.) arose after the joint money market account was established, and cannot plausibly form the basis for such a theory for the motivation for setting up the joint account.

and other misconduct relating to his departure from Piaf,
but she never sued him.

(2) Since the time Mr. Chreky operated Piaf with
Attias in the 1980s, he has had a history of making
sexual advances towards female employees, touching female
employees inappropriately, and having sexual
relationships with employees, all of which exposed Mr.
Chreky to potential litigation. But only Barrett and
Thong ever sued Mr. Chreky based on inappropriate conduct
of that nature.

(3) Mr. Chreky had a sexual relationship with Adele
Doudaklian, a Piaf Salon employee. During the time that
he was having that relationship, Ms. Doudaklian became
pregnant, and she had a son born in 1986. Mr. Chreky
made monthly payments of $1,000 in cash to Doudaklian
until 1989 and thereafter Mr. Chreky made sporadic
payments in varying amounts. Mr. Chreky made these
periodic payments through the 1990s. In 2000 or 2001
Doudaklian told Mr. Chreky that "I'm going to have to
file for child support" and also sent a registered letter
to the Salon to inform him of what "I was going to do."
In 2002, Doudaklian filed an action with the Child
Support Enforcement Agency, and this eventually led to
child support litigation in the Circuit Court for Farifax

County, Viriginia.  As of October, 2004 the child support

enforcement   action   was   ongoing.     That   paternity

litigation ended in Mr. Chreky's favor (even though a

test, apparently deemed unreliable or inadmissible by the

tribunal, showed a greater thatn 99% certainty that Mr.

Chreky was the father).

Any ongoing litigation or the threat of litigation by creditors,

however, does not negate the fact that Mr. Chreky intended Ms.

Chreky to have a joint ownership interest in the joint money

market account.  The evidence is overwhelming (going beyond being

merely clear and convincing) that Mr. Chreky intended Ms. Chreky

to have a joint ownership interest in the account, for the

account to serve as a savings account for the benefit of both of

them, and that he did not merely park the funds in the joint

account (with Ms. Chreky not intended to have any interest in the

account) as a way of making his assets difficult for creditors to

seize.

Moreover, if Mr. Chreky was attempting to place his funds

beyond the reach of creditors, that motive provides a reason why

Mr. Chreky would have affirmatively wanted Ms. Chreky to have an

interest in the account.  Indeed, if he was trying to put his

funds beyond the reach of creditors, he could have used his

salary to pay family expenses, and let Ms. Chreky hold onto her

salary as a source of savings for the couple.

Mr. Chreky's initial transfers into the account as a tenancy by the entireties account, intended to confer upon Ms. Chreky a joint ownership interest, would, of course, have been subject to avoidance if they had been transfers intended to defraud creditors, but that is ancient history. Assuming that they *were* fraudulent transfers, the applicable statutes of limitations make it far too late for those transfers to be avoided as fraudulent transfers now, and no avoidance action was ever attempted.

What I have said about Mr. Chreky's intention that Ms. Chreky have an ownership interest in the money market account applies as well to the CDs and the CDARS account. Ms. Chreky has been the driving force in making decisions regarding investing the money market funds in more financially rewarding investments consonant with the goal of holding these funds as a retirement fund for the benefit of the couple. Mr. and Ms. Chreky used funds from this money market account to periodically purchase CDs in the names of Mr. and Ms. Chreky. Mr. and Ms. Chreky would talk about purchasing CDs, would reach a joint decision, and then Ms. Chreky would meet with the bank to make arrangements for purposes of arranging purchases of CDs. She was always the bank's point of contact to address CD investments. She would meet with Thomas Braden of the bank to go over selecting the length of maturity and interest rate so that the couple would get the best deal. Those CDs mostly provide that they are multiple

24

party accounts with rights of survivorship.  Although Mr.

Chreky's Social Security Number was used for back-up tax

withholding purposes on CDs, the couple has filed joint income

tax returns, and was not subject to back-up tax withholding, and

I view the utilization of Mr. Chreky's Social Security Number as

being of no significance as to whether these were to be jointly

owned funds.

Mr. and Ms. Chreky transferred money from the CDs into the

CDARS account, which is held in the names of both Mr. and Ms.

Chreky, and which was opened in September 2008 in the amount of

$2,625,772.40.  Again, Ms. Chreky was the driving force in

deciding to make this investment.  In 2008, Ms. Chreky became

concerned that a number of banks were going under.  If Adams

National Bank went under, and the couple as a consequence lost

their money at the bank, that was a huge concern to her.  She

spoke to Thomas Braden at Adams National Bank, expressing her

concerns.  Mr. Braden acknowledged that Adams National Bank was

under Federal banking regulator scrutiny, and she expressed her

desire that the funds be held in a way that they were FDIC-

insured.  Mr. Braden suggested that the couple transfer the CDs

into a CDARS account as a way of assuring that they would be

insured.  Ms. Chreky met with the CDARS representative at Adams

National Bank, and set up the CDARS account, all with the

intention that the funds remain the couple's jointly owned funds

consistent with the goal of holding these funds as a retirement account.

To recapitulate, the relationship between Mr. and Ms. Chreky was one in which Mr. Chreky intended Ms. Chreky to have an ownership interest in the Adams National Bank joint money market account, the intention being that the money market account (and the CDs and CDARS accounts purchased from the money market account) were to be a retirement fund for the couple.  Consistent with her role as the financial manager of the couple's affairs (both business and personal), and consistent with the Adams Natonal Bank funds being viewed as the couple's retirement funds, Ms. Chreky did not play a passive role regarding decisions concerning use of the funds.  To the contrary, she was the driving force.

Consistent with the joint ownership of the Adams National Bank funds, Mr. and Ms. Chreky have generally held other major assets as joint owners.  Their real properties are held jointly, and, as will be seen, 99% of SPAC was held by them with their respective interests being held as tenants by the entireties. This was a couple who operated as a financial team, and who intended that the fruits of their financial endeavors, the deposits of Mr. Chreky's salary into the Adams National Bank money market account, were to be jointly owned as a savings account, principally for retirement purposes.

26

F

Here, the overwhelming evidence was clear and convincing
that from the outset there was consideration for the deposits
into the joint accounts, such that the joint account was not
established merely for Mr. Chreky's convenience.  The presence of
consideration for establishing the joint account made the account
jointly owned property and distinguishes this case from
*Harrington* (which recognized an exception for an account
established for consideration) and hence distinguishes this case
as well from the *Harrington* decision's progeny, including *Imirie*.

Ms. Chreky guaranteed substantial obligations of Mr.
Chreky's solely-owned company, Andre Chreky, Inc.  Ms. Chreky
additionally used her salary to meet expenses for which Mr.
Chreky bore a responsibility.  Mr. Chreky was obligated for his
personal expenses, was obligated with Ms. Chreky for joint income
tax liabilities, and naturally was obligated, with Ms. Chreky, to
meet parental expenses relating to their daughters, including
paying for their tuition and medical care.  Moreover, as spouses,
they both bore an obligation to contribute to other household
expenses.  Ms. Chreky used her own salary to fund the SunTrust
account from which household expenses, including Mr. Chreky's
personal expenses and parental expenses relating to the couple's
children, were paid.  Mr. Chreky and Ms. Chreky implicitly agreed
that in exchange for her using her salary to meet household

27

expenses, Mr. Chreky would deposit his salary into the joint account at Adams National Bank to hold as a savings account, owned by both spouses, principally as a retirement fund.

If Mr. Chreky had told Ms. Chreky "you pay the household expenses from your salary, and you guarantee a substantial obligation of my company, but I get to keep my salary for myself," one can well imagine the marital disharmony that would have erupted.  That did not occur: as established by clear and convincing evidence, there was an agreement between the spouses that the Adams National Bank account, into which Mr. Chreky's salary was deposited, would be held for the benefit of both spouses, primarily as a retirement fund, but also for use to meet expenses of the couple for which Ms. Chreky's SunTrust account was inadequate to meet.  Accordingly, the establishment of the joint accounts *was* for consideration, thus making the presumption under *Harrington* and *Imrie* inapplicable.[13]

G

Ordinarily, however, one does not think of married couples as engaging in exchanges of consideration.  If, for that reason, the spouses' conduct cannot be construed as giving rise to Ms. Chreky being given an interest in the Adams National Bank money

---

[13]   Whether such consideration was sufficient to constitute a defense against a fraudulent conveyance claim regarding transfers into the joint market account is an issue for another day.

market account and CDs as consideration for her using her salary
for household expenses and guaranteeing a debt obligation of
Andre Chreky, Inc., and my conclusion that the presumption under
*Harrington* and *Imrie* does not arise is an erroneous conclusion of
law, the presumption would arise.

Even assuming that the presumption arose, it nevertheless
has been rebutted by the clear and convincing evidence of record.
As discussed in part E, above, the evidence overwhelmingly
established that Mr. and Ms. Chreky operated as a financial team,
with Ms. Chreky guaranteeing a substantial debt of Mr. Chreky's
solely-owned company, and acting as the couple's financial
manager, applying her paycheck to family expenses, with Mr.
Chreky depositing his paycheck to the joint money market account
which the couple agreed would be held as a savings account and
principally a retirement fund.  That purpose necessarily included
the right of Mr. or Ms. Chreky, upon the death of the other, to
continue owning the retirement fund via a survivorship interest.

Barrett and Thong argue that Ms. Chreky did not have an
individual, personal right to use the money market funds (and its
proceeds) separate from Mr. Chreky.  That the Chrekys agreed that
they would hold the funds as a retirement fund and for
extraordinary needs of themselves as a couple, however, more than
adequately demonstrates that there was a donative intent on the
part of Mr. Chreky to make Ms. Chreky a joint owner of the joint

accounts.  By conferring upon Ms. Chreky the joint ownership of
the accounts as a retirement fund and for joint needs, Mr. Chreky
was not holding the account solely for his own purposes, with Ms.
Chreky merely being on the account as a convenience to Mr. Chreky
as the real owner of the account.  That distinguishes this case
from *Landman v. Landman*, 136 A.2d 392 (D.C. Mun. App. 1957), in
which there was no showing of a donative intent.  There, the
husband asserted an ownership in the account consisting of funds
belonging to the wife that she deposited into the account, and as
to which he was allowed only to make withdrawals for family
expenses.  The husband conceded that the case did not involve a
donor-donee relationship, with the consequence that the
*Harrington* presumption was not rebutted.  *Landman*, 136 A.2d at
394.  The wife in *Landman* remained the true owner of the account.

That incident to Mr. Chreky's donating an ownership interest
in the account to Ms. Chreky the couple decided to hold the
account for retirement purposes and extraordinary needs
demonstrates a donative intent instead of demonstrating a lack of
donative intent.  Barrett argues that had there been use by Ms.
Chreky of the account for her own personal needs, that would have
tended to demonstrate a donative intent on the part of Mr. Chreky
(*see Prather v. Hill*, 250 A.2d 690, 692 (D.C. 1969)).  She then
argues that it follows that the lack of agreement that she could
use the account for her personal needs demonstrates a lack of

donative intent.  This is a classic error in logic: that X
demonstrates that Y is present does not necessarily mean that an
absence of X demonstrates that Y is not present.  Obviously there
can be a donative intent for a wife to have an interest in a
joint account even though the spouses agree that the account will
be used only for joint needs.

This case is dramatically different from *Imirie*.  There a
patent attorney and agent employed his wife as a salaried
bookkeeper and manager of his office.  246 F.2d at 652.  Shortly
after the couple had wed, he converted two business checking
accounts to joint accounts, but thereafter withdrawals from one
of the accounts continued to be used for the husband's business
purposes, and as to the other account, which continued to be used
for business purposes, there was no clear showing that any of the
relatively few checks signed by the wife on that account were
used for her personal benefit.  *Id.* at 652 n.1.  The husband also
converted his so-called "rent" account, into which he deposited
rents from his real properties, into a joint account, but it was
operated solely for his benefit.  *Id.* at 653.  Finally, he opened
a joint Canadian account with his own funds, but the withdrawals
from it were solely for business purposes.  *Id.*  Upon the
husband's death, the wife claimed ownership of the accounts by
way of survivorship, but none of the evidence clearly showed that
a right of survivorship was intended, even if the wife was given

a right to make withdrawals from the account during the husband's
life so that she could use them in any way she saw fit.  *Id.*

Here, in contrast, the evidence overwhelmingly shows that
the Chrekys acted as a financial team, and worked towards
accumulating the joint money market account (and its proceeds) as
a joint savings account and as a retirement fund.  The account
was not used to meet Mr. Chreky's business operations through
Andre Chreky, Inc., nor was it used for Mr. Chreky's individual
needs, and was clearly devoted instead to the couple's joint
needs as a financial team.  By agreeing that the account was to
be used for joint needs, Mr. Chreky gave up his right to have the
account used for his own purposes.

The money market fund having been jointly owned, and
constituting tenancy by the entireties property, the proceeds of
the money market account (the CDs and the CDARS account) were
tenancy by the entireties property as well, as there was no
evidence establishing an intention to change the tenancy by the
entireties character of the funds via the purchase of those
assets.  *Zyblut*, 691 A.2d at 638.  Even if the *Zyblut* rule were
not on the books, the evidence is clear and convincing that the
CDs and the CDARS account were to be jointly owned.  When Ms.
Chreky moved money market funds into CDs, the reason was to
maximize the investment income of the couple's retirement funds,
not to change the character of the ownership.  Similarly, when

32

Ms. Chreky moved the CDs into the CDARS account, the reason was to insure that the couple's retirement funds would remain FDIC insured in the event that Adams National Bank were to go under, not to change the character of the ownership.

H

Having determined that the joint money market account and its proceeds (the CDs and the CDARS accounts) were to be owned by Mr. and Ms. Chreky jointly, I turn to whether Barrett and Thong rebutted the *Settle* presumption.  Under *Settle*, 8 F.2d at 911, the District of Columbia recognizes the presumption that property, including bank accounts, held by a husband and wife as joint tenants is intended to be held by the entireties, unless proof of a contrary intent leads to a different result.  *See Zyblut*, 691 A.2d at 639.  There was no evidence persuading me that as to this jointly-owned property a tenancy by the entireties was not intended.  The district court pointed to two aspects of the *Settle* presumption, and I will address those in turn.

Presenting Evidence to Rebut the *Settle* Presumption

The district court noted, first, that the *Settle* presumption may be rebutted using factors such as the ones set out in *Zyblut*, 691 A.2d at 640 n.7.  There is nothing in the record to rebut the *Settle* presumption.

Barrett and Thong pointed to one $1,000,000 CD as being

33

payable on death to the Chrekys' daughters and argue that this
defeats the tenancy by the entireties.  A close examination of
the CD, however, reveals to the contrary.  The CD was listed as
"Multiple-Party Account With Right of Survivorship and Pay on
Death," and listed as the pay-on-death beneficiaries the two
daughters.  The character of the CD was that when Mr. Chreky or
Ms. Chreky died, the survivor would become the owner (via the
right of survivorship) of the CD.  Once the survivor died, and
assuming that the CD had not earlier matured or been cashed in by
the survivor before the survivor died, then the CD would be
payable to the daughters as the pay-on-death beneficiaries.  The
addition to the CD of payable-on-death beneficiaries did not
alter the tenancy by the entireties character of the CD.

　　　Similarly, that the joint money market account and the CDs
indicated that only one signature was required to make a
withdrawal does not destroy the tenancy by the entireties
character of those funds.  To paraphrase *Prather v. Hill*, 250
A.2d 690, 692 n.2 (D.C. 1969), "[t]he fact that [Mr. Chreky] had
unlimited access to the account, *also*, is of no consequence."
(Italics in original.)   Such retained power in Mr. Chreky does
not defeat his donative intent that Ms. Chreky was to have a
joint ownership interest in the funds.  *See Imirie*, 246 F.2d at
653 n.2.

　　　The same analysis applies to the CDARS account if it

permitted unilateral withdrawal by Mr. Chreky.  The Custodial

Agreement for that account indicated:

> The following are authorized to give instructions on
> behalf of the undersigned (check all that apply):
>
> _x_ The undersigned (individual or partnership)
> ____ Any of the following individuals.  (List names and
> legal capacities.)
>
> _____ Any _____ of the following officers and their
> respective successors in office.  (List names and their
> titles.)

The "undersigned" were Mr. and Ms. Chreky.  The Custodial

Agreement may actually have required both spouses to give

instructions regarding the account if such instructions were to

be effective.  Even if only one spouse could give instructions,

it does not matter.

Barrett also points to the CDARS account's Customer Request

for Account Placement form and CDARS Deposit Placement Agreement

as failing to make any mention of a right of survivorship.  That

is of no moment because the CDARS account retained the tenancy by

the entireties character of the funds utilized to open the

account, and no evidence has been presented to show an intent to

the contrary.  Indeed, the CDARS Deposit Placement Agreement,

which was a pre-printed form with lines checked or filled in as

applicable, indicated:

> The undersigned, or the undersigned's account is one of
> the following:
>
> ____ Individual
> _x_ Joint <u>Serena Chreky</u>

35

____ Sole Proprietorship
____ Partnership
____ Corporation
____ Custody (including guardain, agent, nominee or
     conservator)
____ Payable Upon Death Account
____ Irrevocable Trust
____ Other

That Serena Chreky was specifically identified as being a joint

owner of the account only strengthens the conclusion that she had

been donated an ownership interest in the funds that had been

used to acquire the CDARS account.  The right of survivorship

carried over from those source funds (the joint money market

account and the CDs) that expressly were held as subject to a

right of survivorship.

   Finally, Barrett and Thong point to the statement of assets

that Mr. Chreky filed in Barrett's lawsuit in the district court,

listing among the assets he owned all of the funds at issue here.

That statement, however, was accurate, as Mr. Chreky was, indeed,

a joint owner of the funds.  At best the statement of assets was

ambiguous, and it sheds no light on the issues being litigated

now.

Attacking the Transfers of the
<u>Entireties Funds as Fraudulent Conveyances</u>

   Next, the district court observed:

   if the tenancy by the entireties was established by a
   conveyance or assignment (but not if it was always a
   tenancy by the entireties), then a party may rebut the
   *Settle* presumption by showing, by clear and convincing
   evidence, that the conveyance or assignment was

fraudulent.

Mem. Dec. at 8, citing *Zyblut*, 691 A.2d at 640-41.  In *Zyblut*, a creditor of Chester Zyblut brought an action under the Fraudulent Conveyance Act, D.C. Code § 28-3101 (1991) (since superseded by the Uniform fraudulent Transfer Act of 1995, D.C. Law 11-83, which now appears in D.C. Code §§ 28-3101--3111 (2001)).  It is in that sense, therefore, that the effects of the *Settle* presumption can be undone by way of showing a fraudulent conveyance.

Even if the property at issue here had become exempt under 11 U.S.C. § 522(l) by reason of no one objecting to the exemptions in a timely fashion, that would not have immunized the property from becoming recovered by way of avoiding the transfer of the property as a fraudulent conveyance.  *See In re McNamara*, 273 B.R. 132, 136 (E.D. Mich. 2002) ("[A] decision regarding an objection to an entireties exemption does not affect a court's ability to determine whether a fraudulent conveyance has occured.").  That the property is declared to be exempt does not immunize the property from being recovered by a creditor by way of showing under a state fraudulent conveyance statute or under 11 U.S.C. § 548 that there was a fraudulent conveyance.

It is in that sense that the *Settle* presumption that the property is held by the spouses as tenants by the entireties can be rebutted.  It is not a matter of the property not being

37

tenancy by the entireties property (it is, even if it is held as a result of a fraudulent conveyance). Instead, it is a matter of setting aside and recovering the property held by the tenants by the entireties as having been transferred into such form of ownership by way of a fraudulent conveyance.

In a bankruptcy case, 11 U.S.C. § 544 vests in the trustee a creditor's right to set aside fraudulent conveyances under the D.C. statute. The trustee may alternatively attempt to set aside a transfer as a fraudulent conveyance under the slightly different provisions of 11 U.S.C. § 548. The power to pursue avoidance and recovery of fraudulent conveyances rests in the trustee, not in creditors. When a transfer is avoidable as a fraudulent conveyance under either the D.C. statute or 11 U.S.C. § 548, a creditor is not authorized to pursue setting aside the transfer as a fraudulent conveyance unless the creditor has sought and obtained permission from the bankruptcy court to act in the trustee's stead. *See PW Enters., inc. v. North Dakota (In re Racing Servs. Inc.)*, 363 B.R. 911, 916 (B.A.P. 8th Cir. 2007); 5 Collier on Bankruptcy ¶544.07[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).[14] Such permission has not been sought in

---

[14] Here, the debtor, as a debtor in possession, enjoys the powers of a trustee pursuant to 11 U.S.C. § 1107. The debtor's failure, without good cause, to pursue a fraudulent transfer may be grounds for appointing a trustee (or for dismissing the case or converting the case to chapter 7, a chapter in which a trustee is always appointed). Even when it is the debtor in possession who has the power to pursue fraudulent conveyances, creditors are

this case.

The district court's reference to rebutting the *Settle*
presumption by way of showing that there was a fraudulent
conveyance cannot be read as doing away with the requirement that
court permission be sought before a creditor can exercise a
trustee's right to pursue fraudulent conveyances.  Nor can it be
read as treating property that is held as tenants by the
entireties property as not being such (and hence exemptible as
such) simply because the transfers of property into the tenancy
by the entireties account can be set aside as a fraudulent
conveyance.  The district court itself recognized that this court
had not addressed the *Settle* presumption, and it declined to
apply it as well.

As noted already, Barrett and Thong agreed that the issue of
fraudulent conveyances was not to be tried as part of the trial
of the objection to exemptions.  Their right to pursue fraudulent
conveyance actions remains unaffected by the determination that
the property is held by Mr. and Ms. Chreky as tenants by the
entireties such that Mr. Chreky's interest is exempt.

II

SPAC, LLC EXEMPTION ISSUE

"SPAC" was an acronym for Mr. and Ms. Chreky's names: S for

---

not authorized to pursue the same without having sought and
obtained court permission to pursue the same.

39

Serena and P for Patrice (Ms. Chreky's middle name), A for Andre,
and C for the couple's last name.  Since the formation of SPAC,
LLC, Ms. Chreky has owned a 1 percent membership interest
outright.  As to the remaining 99% membership interest, the SPAC,
LLC Operating Agreement lists the members as:

> Serena Chreky and Andre Chreky, tenants by the entireties
> with the right of survivorship as at common law

Operating Agreement at 14.[15]  Mr. and Ms. Chreky each signed the
Operating Agreement under that designation of their being
members.  They clearly intended that whatever interest Mr. Chreky
thereby owned in SPAC, LLC, he would hold it as a tenant by the
entireties.

Section 5.2.5 of the Operating Agreement provided:

> In the event that any Member composed of more than one
> Person in a joint capacity cannot agree as to the manner
> to vote such Persons [sic] joint interest, than [sic]
> that Member shall not be entitled to vote and such
> Member's Interest Shall Be Disregarded for Purposes of
> Determining the Percentages entitled to vote.

The clear import of that provision was that if Mr. and Ms.
Chreky, treated by the Operating Agreement as a single member as
tenants by the entireties as to a 99% interest in the LLC, and
thus as owners jointly of the 99% membership interest, could not
agree on a vote, then that 99% membership interest would not
vote, and Ms. Chreky as the remaining 1% member would cast the

-----

[15]   See also Operating Agreement at 2, 5-6 (defining
"Member" and "Percentage"), and at Exhibit A (listing the Members
and their Percentages).

40

deciding vote.

SPAC, LLC receives $30,000 a month in rent from Andre
Chreky, Inc.  Those funds are used to pay taxes and for
maintenance, with any excess funds generally being held in the
bank account of SPAC, LLC, or in certificates of deposit.  On one
occasion, however, Ms. Chreky made a draw from SPAC, LLC, of
$60,412.75 on April 16, 2007, which was placed in Ms. Chreky's
SunTrust account, the account the couple used for meeting
household expenses, and was used to pay the couple's joint income
tax liability.  This use of funds for joint purposes buttresses
the conclusion that whatever membership interest Mr. Chreky held
in SPAC, LLC, that  membership interest was, as stated in the
operating agreement, intended to be held by him as a tenant by
the entireties.

SPAC, LLC borrowed $900,000 in November 1996 when it
acquired its building, and incident to that loan, Mr. and Ms.
Chreky were joint guarantors and put up their Great Falls,
Virginia home (a property owned as tenants by the entireties) as
collateral via an indemnity deed of trust.  The joint guarantees
and encumbering of jointly owned real property buttresses the
inference that as to the 99% interest in SPAC, LLC (after Ms.
Chreky's solely owned 1% interest) the ownership of that 99%
interest was a joint endeavor, and that whatever membership
interest Mr. Chreky held in SPAC, LLC was intended to be held by

41

him as a tenant by the entireties.

Mr. Chreky claimed whatever interest he has in SPAC, LLC to be exempt as tenancy by the entireties property.  I ruled that Mr. and Ms. Chreky, as husband and wife, were a member of the LLC, holding a 99% interest as tenants by the entireties, and thus overruled the objection to this exemption.  On appeal, the district court ruled:

> [A] married couple is neither an individual nor an entity that may be a member in an LLC.  Mr. and Ms. Chreky's membership in SPAC, LLC, is thus not permitted under the law.
> Although a married couple may not be a "member" in an LLC, a married person can hold his individual membership in the LLC as a tenancy by the entireties with his spouse.  "A membership interest in a limited liability company is personal property." D.C. Code § 29-1033.  Thus, for example, if Mr. Chreky were a member of an LLC, he could hold that membership interest as a tenant by the entireties with Ms. Chreky, even though Ms. Chreky was not a member.
> The Bankruptcy Judge has not yet considered the issue of who is properly a member of SPAC, LLC, nor whether that person holds his membership as a tenant by the entireties with his spouse.  The Court will accordingly reverse the Bankruptcy Judge on the legal issue, and remand to the Bankruptcy Judge for findings of who actually holds the membership interest currently being held in name by Mr. and Ms. Chreky, and for findings of whether that person holds the membership as a tenant by the entireties.

Mem. Op. of May 2, 2011, at 14.  As set forth below, the outcome is the same applying the law as enunciated by the district court: whatever interest Mr. Chreky has in the LLC was held by him as a tenant by the entireties, and thus that interest was properly claimed as exempt.

42

Plainly Mr. and Ms. Chreky did not intend the 99% interest
of Mr. and Ms. Chreky to be a nullity (based on the inability of
a married couple to be a member in an LLC).  They were unaware of
any inability of them as a married couple to be a member of the
LLC, but their intent is nevertheless relevant to ascertaining
who actually holds the 99% membership interest.  Treating the 99%
membership interest as being held by them as individuals, not as
a couple, their unmistakable intent was that whatever interest
each of them held would be held as a tenant by the entireties
with the other spouse.

By designating the 99% interest as held by "Serena Chreky
and Andre Chreky, tenants by the entireties with the right of
survivorship as at common law," they intended that, as
individuals (a category of the term "entity" authorized to be a
member of an LLC) they would in combination own a 99% membership
interest, with each of them holding their respective membership
interest as tenants by the entireties with the other spouse.
Their intention, as best effectuated under the law as enunciated
by the district court, was that, aside from Ms. Chreky's outright
ownership of a 1% membership interest, each of them was to hold a
49.5% membership interest in the LLC (a combined 99% of
membership interests in the LLC), but with each of them holding
their respective interest as a tenant by the entireties with the
other spouse.  Ultimately the result is that they hold 99% of the

43

membership interests in the LLC as tenants by the entireties, but
the route in reaching that result is through their each
individually holding a 49.5% interest that they each, in turn,
hold as a tenant by the entirety for the other spouse.
Accordingly, Andre Chreky properly claimed his membership
interest in SPAC, LLC (whatever that membership interest might
be) to be exempt as held as a tenant by the entireties with Ms.
Chreky.

     The clear and convincing evidence in that regard has not
been rebutted by any of the evidence in the record.  The Forms
K-1 issued by SPAC, LLC, for 2005 through 2008, to Mr. Chreky
listed his "type of entity" as "individual," without indicating
that the ownership interest was as a tenant by the entireties.
The Forms K-1 referred to Ms. Chreky's interest similarly as
being that of an individual.  The reference to "individual"
without mention of the tenancy by the entireties does not alter
the fact, as observed by the district court, that an individual
may own a membership interest in an LLC and yet hold that for
himself and his spouse as tenants by the entireties.  The Forms
K-1 for Mr. and Ms. Chreky listed their respective share of the
profits, loss, and capital as 50%, when for tax purposes Mr.
Chreky's interest have been listed as 49.5% and Ms. Chreky's as
50.5% (49.5% held by her as a tenant by the entireties and 1%
held by her outright).  There is no evidence that this was

44

anything but an honest mistake by the accountants that was not picked up by Ms. Chreky or Mr. Chreky.  (A similar and even more glaring error was made on tax returns regarding the ownership of Andre Chreky, Inc., with Mr. and Ms. Chreky each being treated as owning a 50% interest, when Mr. Chreky actually owned 100% of that corporation, and that error similarly was not spotted by Mr. and Ms. Chreky.)  Mr. Chreky, who signed SPAC, LLC's and Andre Chreky, Inc.'s returns, is not sophisticated in financial matters, as was evident from his fumbling with navigating tax documents when on the stand, and it is understandable that he failed to spot this error, which had no tax consequences because he and Ms. Chreky filed a joint income tax return (such that for tax purposes the effect is to treat them as having a 100% share of the profits, loss, and capital of the LLC).  The error is insufficient to rebut the SPAC, LLC Operating Agreement, and the testimony of Mr. and Ms. Chreky which clearly established that Ms. Chreky owned a 1% membership interest and that she and Mr. Chreky in combination own the remaining 99% interest as tenants by the entireties.  There has been no showing that the creation of a tenancy by the entireties as to Mr. Chreky's interest in SPAC, LLC was a sham with Mr. Chreky actually intended to have outright ownership of his interest in SPAC, LLC.

III

An order follows, overruling Barrett's and Thong's

45

objections to exemptions.

[Signed and dated above.]

Copies to: Debtor; recipients of e-notifications in case.